(28 P.3d 413)

No. 85,354

FARMERS GROUP, INC., FARMERS INSURANCE EXCHANGE, TRUCK INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY, FARMERS INSURANCE COMPANY, INC., and FARMERS NEW WORLD LIFE INSURANCE COMPANY, *Appellants/Cross-appellees*, v. TERRY G. LEE, *Appellee*, and CAROL N. ARNOLD, MAURICE W. BOURQUIN, DAWN R. LANSING, and DOUGLAS A. LANSING, *Intervenors/Appellees/Cross-appellants*.

Opinion filed June 29, 2001.

*Martha A. Halvordson*, of Bioff Finucane Coffey & Holland, LLP, of Kansas City, Missouri, for appellants/cross-appellees.

*Terry G. Lee*, pro se appellee.

*Richard T. Merker* and *James L. MowBray*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, for intervenors/cross-appellants.

Before PIERRON, P.J., GREEN and BEIER, JJ.

BEIER, J.: This case arises out of a dispute between Terry Lee and his former employer, Farmers Group, Inc., and its related entities (Farmers). It requires us to decide whether Kansas public policy permits an employer to buy a former employee's silence about nonconfidential matters and thus prevent the employee from testifying on behalf of or otherwise assisting third parties who bring claims against the employer.

Lee worked for Farmers as a branch claims manager and a regional liability claims manager. At the time Lee left the company in spring 1994, he dismissed a charge against Farmers pending before the Equal Employment Opportunity Commission and signed a severance agreement in exchange for a payment in excess of $100,000. In the severance agreement, Lee agreed not to participate voluntarily in litigation against Farmers and to notify it immediately if anyone attempted to compel his testimony in any litigation "regarding Farmers' business and employment practices."

The severance agreement also contained confidentiality clauses and a liquidated damages provision, and it required Lee to share and review information or participate in litigation on Farmers' behalf. It stated in pertinent part:

"10. Lee agrees that he will not disclose and will do everything possible to maintain in confidence a) the terms of this Agreement and b) the facts and circumstances of any alleged discrimination, defamation, harassment, breach of contract, tort or violation of any law by Farmers against Lee or any agent or employee of Farmers.

. . . .

"12. If Lee breaches any or all of the terms of [the confidentiality clause in Paragraph 10 or the litigation provision in Paragraph 11] of this Agreement, Lee shall not receive any monies which have not been paid to him under this Agreement. If all monies due under this Agreement have been paid to Lee, Lee shall pay Farmers $20,000. Lee agrees that the $20,000 is fair and reasonable in light of the nature and extent of the damages to Farmers['] business and reputation in

the event of a breach and in light of the time, expense and difficulty involved in proving the damages.

"13.   Lee agrees that he shall not disclose or utilize any trade secrets, confidential information, or other proprietary information acquired during the course of his employment with Farmers, including without limitation, internal Farmers financial information, operational procedures, or business plans. . . . Lee agrees that, upon Farmers' request, he will cooperate with Farmers in providing information regarding Farmers' business and employment activities in which he was involved; if requested in writing by Farmers, Lee's cooperation will include, without limitation, meetings, review of records and preparation for and presentation of testimony."

When Lee began voluntarily participating in litigation against Farmers a few months later, Farmers filed this action. Lee participated in the ensuing proceedings only haphazardly, and Farmers obtained a permanent injunction at an ex parte nonevidentiary hearing. The injunction provided in pertinent part:

"Defendant and all those persons acting in concert with him are permanently enjoined from committing or attempting to commit the following acts:

"A.   participating or assisting in the prosecution of any claims against Farmers . . . .

"B.   disclosing or utilizing any trade secrets, confidential information, or other proprietary information acquired during the course of his employment with Farmers Insurance Exchange, including internal financial information, operational procedures, or business plans . . . .

. . . .

"E.   engaging in any other conduct or communication which violates the Agreement."

On several occasions before and after the entry of the permanent injunction, the same district judge who issued it found Lee in contempt for violating its restrictions or those of predecessor temporary orders. On one of these occasions, Lee appealed to this court, arguing that Farmers had an adequate remedy at law. We rejected the appeal on the procedural ground that Lee had failed to raise that argument in the district court. *Farmers Group v. Lee*, Case Nos. 73,592, 74,242, and 75,086, unpublished opinion filed June 28, 1996. Lee never otherwise appealed or challenged the scope or language of the injunction.

Approximately 5 years after the filing of the injunction, it came under fire from a new direction. Carol N. Arnold, Maurice W.

Bourquin, Dawn R. Lansing, and Douglas A. Lansing moved to intervene and to modify or set aside the injunction, arguing that Lee should be permitted to testify as their expert in a pending action against one of the Farmers companies. The district court granted them relief, stating from the bench:

"The Court finds that the injunction previously entered against Mr. Lee must be modified from this date forward to omit the order that he not participate or assist in the prosecution of any claims against Farmers. Those portions of the injunction that pertain to legitimate trade secrets, confidential information and proprietary information remain intact. However, the Court finds that testimony as to Farmers' ordinary claims procedures are not trade secrets or proprietary information, and therefore he may be called as a witness by the intervenors to testify regarding Farmers' claims procedures."

Farmers appeals from the modification of the injunction, arguing that the district court erred in allowing the intervention, in holding that an injunction forbidding Lee from testifying against Farmers violated public policy, and in concluding that Farmers' ordinary operating procedures were not proprietary and confidential. Intervenors cross-appeal, arguing that all of the previous contempt citations of Lee also should be set aside and that the liquidated damages provision in the agreement constituted Farmers' sole remedy against Lee for breach. Lee failed to perfect a cross-appeal, and his attempt to raise an additional issue will not be addressed.

### Intervention

Farmers claims the trial court lacked authority to permit intervention. To the extent we must construe the rules pertaining to intervention, our review is de novo; the district judge's decision to permit intervention based on those rules and the facts before it is subject to review for abuse of discretion. See *State Bd. of Nursing v. Ruebke*, 259 Kan. 599, 611, 913 P.2d 142 (1996); *Mohr v. State Bank of Stanley*, 244 Kan. 555, 770 P.2d 466 (1989) (denial of motion to intervene discretionary).

K.S.A. 60-224 provides:

"(a) *Intervention of right.* Upon timely application anyone shall be permitted to intervene in an action: (1) When a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the dis-

position of the action may as a practical matter substantially impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

"K.S.A. 60-224(a) should be liberally construed in favor of intervention." *Roberts v. Krupka*, 246 Kan. 433, 443, 790 P.2d 422 (1990). The court should consider whether the party timely applied, whether the party had a substantial interest in the subject matter, and whether the party could otherwise adequately protect his or her interests. *Herrmann v. Board of Butler County Comm'rs*, 246 Kan. 152, 155, 785 P.2d 1003 (1990).

Intervenors' effort to become involved in this action was timely, as it appears to have been pursued when they learned the injunction raised an obstacle to Lee's testimony in their case. See *Krupka*, 246 Kan. at 443-44 (party not required to intervene until interests implicated).

Further, intervenors assert that their due process right to secure the services of Lee as an expert is threatened by the injunction. "The right to examine and cross-examine witnesses testifying at any judicial or quasi-judicial hearing is an important requirement of due process." *Santee v. North*, 223 Kan. 171, 173, 574 P.2d 191 (1977). Potential violations of constitutional rights can warrant intervention. See *Johnson v. Mortham*, 915 F. Supp. 1529, 1536 (N.D. Fla. 1995) (registered voters have standing to intervene, challenge voting district in which registered). We are satisfied that the district judge did not err in arriving at the conclusion that intervenors had a substantial interest in the subject matter of this action.

We also can imagine no comparably efficient and effective method for protecting intervenors' interests. They adopted the most direct strategy: Ask the district judge responsible for the injunction to consider modifying or dissolving it.

## K.S.A. 60-910(b)

The district judge found that intervenors satisfied the requirements of K.S.A. 60-910(b), which provides that any interested party may petition to have a judgment of permanent injunction vacated or modified upon a showing of changed conditions and an adverse

effect on the party's interests. Farmers argues that intervenors demonstrated no change of conditions. Intervenors respond that the later-developing effect of the injunction on their personal right to call Lee as a witness in their case is change enough to satisfy the statute.

We agree with intervenors. When the injunction was put in place, intervenors were not yet on the scene. The district judge did not have the benefit of any arguments they might make regarding the effect of the injunction on their ability to pursue their cause of action.

Our holding on K.S.A. 60-910(b) eliminates the need for us to address the potential applicability of K.S.A. 60-260(b)(6) to intervenors. That section permits a court to vacate or amend an order for any reason justifying relief from the order's operation. We view the district judge's decision to permit intervention to question the injunction in this case as sound. It needs no further support.

### Public Policy

After ruling that intervention was appropriate and that intervenors qualified to challenge the injunction, the district judge modified the injunction on public policy grounds. Her conclusion that the agreement as incorporated in the injunction violated Kansas public policy is reviewable de novo. See *Weber v. Tillman*, 259 Kan. 457, 461-62, 913 P.2d 84 (1996) (decision whether noncompetition covenant in employment contract contravenes public policy subject to de novo review).

Generally speaking, Kansas enforces written agreements between capable parties. See *Puritan-Bennett Corp. v. Richter*, 8 Kan. App. 2d 311, 316, 657 P.2d 589, *rev. denied* 233 Kan. 1092 (1983) (remanding with directions to the trial court to enforce noncompete agreement through appropriate equitable remedy). In order to qualify for an exception to this basic rule, intervenors must show a similarly compelling policy entitling them to develop and present the sort of testimony Lee originally agreed to refrain from presenting.

Other jurisdictions have addressed the public policy considerations affecting agreements such as the one before us when

prompted by the behavior of another roving ex-employee witness, Ronald Elwell. Elwell has testified on behalf of third parties with claims against his former employer, General Motors Corp. (GM), see *Baker et al. v. General Motors Corp.*, 522 U.S. 222, 226, 139 L. Ed. 2d 580, 118 S. Ct. 657 (1998); the continuing development of case law governing his activities constitutes another change of circumstances justifying the district judge's reconsideration of the injunction in this case.

In *Smith v. Superior Court*, 41 Cal. App. 4th 1014, 49 Cal. Rptr. 2d 20, *reh. denied* (February 5, 1996), *rev. denied* (April 18, 1996), the court found that enforcement of a Michigan injunction designed to muzzle Elwell would violate the public policy of California. It noted that counsel for the third parties attempting to use Elwell's testimony had submitted declarations showing Elwell was a crucial witness and that GM's efforts to rebut these declarations were ineffective. The court also noted that the scope of the evidence suppressed by the injunction was far broader than that covered by the attorney-client privilege, work product doctrine, or trade secrets law. Further, the third parties' interests were not before the Michigan court that had issued the injunction. 41 Cal. App. 4th at 1021-22. The court concluded:

"The Michigan injunction, derived exclusively from a voluntary agreement between Elwell and GM, results in the suppression of highly relevant, discoverable evidence most probably very damaging to GM's position . . . .

"The agreement and resulting injunction not only violate our fundamental public policy against suppression of evidence, but recognition of the injunction would undermine the fundamental integrity of this state's judicial system. We can imagine no stronger instance compelling application of the public policy exception to the full faith and credit clause." Cal. App. 4th at 1026.

Likewise, in *Williams v. General Motors Corp.*, 147 F.R.D. 270 (S.D. Ga. 1993), a federal district court in Georgia refused to enforce the Michigan injunction to prevent Elwell's testimony on nonconfidential matters:

"[T]he Michigan injunction on its face—and as GM seeks to apply it here—extends far beyond matters that might legitimately qualify for protection under an attorney-client or work-product privilege, or which disclosure would qualify as misappropriation of trade secrets. . . . [As such,] the Michigan order . . . violates Georgia public policy. . . .

. . . .
. . . Any interest GM might have in silencing Elwell as to unprivileged or non-trade-secret matters is outweighed by the public interest in full and fair discovery." 147 F.R.D. at 272-73.

See also *Meenach v. General Motors Corp.*, 891 S.W.2d 398, 401-02 (Ky. 1995) (Kentucky court may, on public policy grounds, modify Michigan injunction to limit Elwell's testimony to only nonconfidential relevant facts; neither Full Faith and Credit Clause nor rule of comity compel recognition of broader restrictions).

An Arizona federal district court took a similar position in *Hannah v. General Motors Corp.*, 969 F. Supp. 554, 559-60 (D. Ariz. 1996), holding that its state's public policy would be violated by enforcing the blanket Michigan prohibition on Elwell's testimony:

"Arizona . . . has a strong, clearly defined policy of encouraging full, fair, open disclosure of all relevant, material evidence within a case. . . .

"Furthermore, the question of what evidence can be heard in a court of law touches upon fundamental issues concerning the judiciary's very existence. This court, indeed every court throughout the nation, exists to serve the ends of justice. When a case cannot be resolved through motion practice this job invariably turns from an analysis of legal principles to a search for the truth. At that point the court must serve as a gatekeeper of evidence; allowing in all that conforms to the web of procedural and evidentiary rules that govern modern litigation. These rules have evolved over time to ensure that the facts presented to the jury are untainted by prejudice or bias . . . . The Michigan injunction usurps these rules by keeping out *all* of Elwell's testimony. This in turn prevents the jury from making a determination based upon all the relevant, admissible evidence. The effect is an obscured search for truth."

Most recently, the United States Supreme Court has reviewed the Elwell injunction, holding that a Missouri court's refusal to enforce it in a suit brought by third parties against GM would not run afoul of the Full Faith and Credit Clause. See *Baker*, 522 U.S. at 235-41. The Supreme Court disclaimed a public policy basis for its holding, stressing that the Michigan court lacked authority over the third-party plaintiffs and their cause of action.

Here, of course, we are not faced with a Full Faith and Credit Clause complication. The district judge was reevaluating the merit of her own injunction, which she was certainly empowered to do. We need only decide whether we agree with her conclusion that

the original injunction incorporating the parties' agreement contravened Kansas public policy.

We agree that the original injunction overstepped. Kansas law is clear that an ex-employee may be enjoined from disclosing confidential material and trade secrets gained in the course of his or her employment. See K.S.A. 60-3321(a); *Koch Engineering Co. v. Faulconer*, 227 Kan. 813, 610 P.2d 1094 (1980). Moreover, our libel, slander, false light invasion of privacy, and tortious interference precedents serve to deter untruthful and unprivileged statements by the merely malicious, including former employees. See *Dominguez v. Davidson*, 266 Kan. 926, 974 P.2d 112 (1999) (false light invasion of privacy); *Riddle v. Wal-Mart Stores, Inc.*, 27 Kan. App. 2d 79, 998 P.2d 114 (2000) (libel and slander); *Drake v. Benedek Broadcasting Corp.*, 26 Kan. App. 2d 289, 983 P.2d 274, *rev. denied* 268 Kan. 886 (1999) (tortious interference with a contract).

The problem is that the agreement and the injunction under scrutiny here purported to prevent Lee from disseminating even nonconfidential, truthful information when called upon to do so in connection with a claim against his former employer. We agree with the California, Georgia, and Arizona courts quoted above: Permitting employers to silence former employees in such a manner ultimately undermines not only individual third-party plaintiffs' abilities to vindicate their rights but the judicial system itself.

As is often stated, "the public has a right to every man's evidence." *Berst v. Chipman*, 232 Kan. 180, 188, 653 P.2d 107 (1982) (citing 8 Wigmore on Evidence § 2192, p. 70 [McNaughton rev. 1961]); accord *United States v. Bryan*, 339 U.S. 323, 331, 94 L. Ed. 884, 70 S. Ct. 724 (1950). "Any exceptions to the demand for every man's evidence are not lightly created nor expansively construed since they are in derogation of the search for truth." *Kansas Gas & Electric v. Eye*, 246 Kan. 419, 427, 789 P.2d 1161 (1990) (citing *United States v. Nixon*, 418 U.S. 683, 710, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 [1974]); see also *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, 172-74, 955 P.2d 1169 (1998) (holding plaintiffs' interests in pursuing remedy for injury, obtaining discovery of relevant facts, can outweigh statutory peer review privi-

lege). The district judge was correct in limiting the reach of the agreement and the injunction on public policy grounds.

### Operating Procedures as Confidential Material

Farmers also argues that the district judge erred in permitting testimony about its ordinary operating procedures because Lee specifically agreed not to disseminate this confidential information. The agreement provided that Lee would not "disclose or utilize any trade secrets, confidential information, or other proprietary information acquired during the course of his employment with Farmers, including without limitation, internal Farmers financial information, operational procedures, or business plans." Thus the only operating procedures that may not be disclosed under the agreement are those that are trade secrets, confidential, or proprietary.

Because the district judge preserved those aspects of the original injunction that prevented the disclosure of confidential information or trade secrets, Farmers should be adequately protected. We interpret the district judge's order to mean that Lee may testify about only those ordinary operating procedures that are not covered by the agreement or the injunction, *i.e.*, nonconfidential ordinary operating procedures.

### Previous Contempt Citations and Liquidated Damages

Intervenors also argue that Lee should be relieved from the consequences of the previous contempt orders and that the liquidated damages provision in the agreement gave Farmers an adequate remedy, foreclosing injunctive relief. These are not intervenors' issues to raise, and Lee is foreclosed from raising them by his previous inaction and procedural defaults.

Affirmed.