**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 17, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RETIREE, INC.,

      Plaintiff - Appellee,

v.

DANA ANSPACH; SENSIBLE MONEY,
LLC,

      Defendants - Appellants.

No. 15-3101
(D.C. No. 2:12-CV-02079-JAR)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **LUCERO** and **BACHARACH**, Circuit Judges.
_____

Retiree, Inc., filed suit against Dana Anspach and Sensible Money, LLC,

alleging breach of a confidentiality agreement. Following a bench trial, the district

court ruled in favor of Retiree, entered a permanent injunction, and awarded Retiree

$500,000 in liquidated damages. Defendants now appeal. Exercising jurisdiction

under 28 U.S.C. § 1291, we affirm in part and reverse in part.

**I**

Retiree is a retirement-planning firm specializing in decumulation—the

process of efficiently drawing down retirement assets. As described by Retiree

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

principal William Meyer, the company attempts to extend asset longevity by coordinating five elements: (1) asset allocation, which refers to the mix of stocks and bonds in a portfolio; (2) tax efficiency, which looks to increase the after-tax amount of assets; (3) asset location, which concerns the placement of investments in particular accounts; (4) withdrawal sequencing, which refers to the order of account withdrawals; and (5) Social Security claiming strategies. Retiree spent more than three years developing its "big model"—an Excel spreadsheet coordinating the five elements, which includes more than 800 rows of tax calculations. The company has also developed a simplified "QuickStart" model which generates free client reports showing side-by-side comparisons of various decumulation strategies.

Anspach is a Certified Financial Planner and has earned a Retirement Management Analyst designation from the Retirement Income Industry Association ("RIIA"). Since 2008, she has authored a popular retirement-planning blog. In early 2011, she was a principal of Wealth Management Solutions ("WMS"), a financial planning and investment advisory firm. According to Meyer, decumulation was not Anspach's niche practice at WMS, although she was familiar with the decumulation concepts identified above.

In February 2011, Meyer contacted Anspach and the two began considering merging Anspach's portion of WMS' practice into Retiree. In March 2011, Anspach left WMS. She signed a Confidentiality, Non-Compete and Invention Ownership Agreement (the "Confidentiality Agreement") with Retiree. In the Confidentiality Agreement, Anspach acknowledged that she would receive "Confidential

Information," which was defined as "certain confidential and proprietary information concerning, without limitation, trade secrets, software products, software designs, specifications, processes, plans, or other ideas or inventions relating to the financial services industry." Anspach agreed that she would "not use the Confidential Information other than for the purposes of [her] business with [Retiree]" and would "not disclose, publish or otherwise reveal any of the Confidential Information received from [Retiree] to any other party whatsoever except with the specific prior written authorization of [Retiree]." The Confidentiality Agreement also contained a liquidated damages provision requiring Anspach to pay Retiree $250,000 for each violation. During her affiliation with the company, she received access to documents Retiree considered confidential and proprietary, including the QuickStart spreadsheet. She was not provided access to the "big model," although Meyer showed her portions of it.

Shortly after leaving WMS, however, Anspach decided against joining Retiree. She instead formed a new company called Sensible Money. In February 2012, Retiree filed suit alleging Anspach and Sensible Money had breached the Confidentiality Agreement by using Retiree's Confidential Information and by disclosing that Confidential Information to third parties. Retiree sought both injunctive relief and damages. The district court held a preliminary injunction hearing followed by a bench trial.

At those proceedings, Meyer testified that as of 2011 very few retirement advisors focused on decumulation, and that none efficiently coordinated Retiree's

3

five elements. Meyer repeatedly stressed that the true value of the Retiree model was the ability to coordinate these five components. He conceded that each individual element is simple to understand, but testified only Retiree (and perhaps one other competitor) was able to comprehensively coordinate all five factors. Meyer also testified that interactions between the components made Retiree's process exponentially more complex. For example, withdrawal sequencing strategies appearing optimal when viewed in isolation might result in more Social Security income being subject to taxation, and maximizing tax efficiency in turn requires proper asset location. However, Meyer acknowledged that many aspects of Retiree's complex methodology were in the public sphere because, for example, Retiree principals authored publications explaining portions of the model. But Meyer suggested that the publications were generally limited to case studies, and disclosed only limited information on the underlying methods.

To support Retiree's use claim, Meyer compared Anspach's spreadsheets from before and after her association with Retiree. He noted that the "pre-Retiree" spreadsheet contained several of Anspach's annotations identifying gaps in her model—in particular that "a tax calculation needs to be developed," and that the document should show "ideal allocation based on an algorithm that needs to be defined/developed." Further, Meyer observed that the pre-Retiree spreadsheet lacked Social Security strategies. Meyer then offered Anspach's more sophisticated "post-Retiree" spreadsheet, which allowed Anspach to coordinate Social Security benefits and withdrawal sequencing to minimize taxes. The post-Retiree spreadsheet also

4

included information regarding the proper amounts to draw from taxable and tax-deferred accounts.

Anspach further developed her post-Retiree spreadsheet by the time of trial. In June 2013, she authored a document describing her new "Spreadsheet 2.0" and identifying "key differentiators" that "make it different from current planning projection models." Anspach stated that Spreadsheet 2.0: (1) allows users "to see which years you have tax opportunities in a way that no other tool does"; (2) "[a]ccurately incorporate[s] the taxation of Social Security"; and (3) has "[t]he ability to tie withdrawal strategy to a specific investment allocation by account type." Meyer testified that the spreadsheet disclosed to Anspach does each of these things.

Anspach's testimony differed sharply from Meyer's. She stated that although planners use different terms and methods, the industry standard is for every financial planner to advise clients in coordinating the five elements Meyer identified. She denied that her spreadsheets use Retiree's Confidential Information, claiming she obtained her information from commercially available software. And she distinguished her spreadsheets from Retiree's by averring that hers could not automatically coordinate tax and Social Security information.

As to Retiree's disclosure claim, Meyer testified that Anspach presented her post-Retiree spreadsheets at RIIA events. Anspach denied promoting her spreadsheet at the events, arguing that she only presented client reports which resulted from the model. Retiree also argued that a book Anspach published included case studies which constituted disclosure.

5

The district court found that Anspach violated the Confidentiality Agreement "by appropriating the processes and methodology that underlay Retiree's software and practices." It rejected Anspach's position that Retiree's methods were commonplace, noting that after Anspach began calling "notably similar methodologies and processes her own," she herself described them as "novel, unique and cutting-edge in the industry." The differences between Anspach's pre- and post-Retiree spreadsheets, the court found, was "compelling" circumstantial evidence that Anspach used Retiree's Confidential Information. It noted that Anspach was able to develop a spreadsheet similar to Retiree's in just six months, while Retiree's process took several years. The court also held that Anspach disclosed Confidential Information to Retiree's competitors. It awarded $500,000 in liquidated damages ($250,000 each for the use and disclosure breaches), and entered a permanent injunction.

Anspach and Sensible Money moved to alter or amend the judgment. The district court granted the motion in part. It clarified that the damages award was entered only against Anspach, not Sensible Money. The court also set forth the terms of its permanent injunction:

> Defendants shall be permanently enjoined from using their Post-Retiree Spreadsheets/Excel Models and shall remove all material on their website that was created using these spreadsheets/models, in particular their case studies page and The Free Report. Defendants are further enjoined from utilizing their Post-Retiree Spreadsheets/Excel Models in presentations, speaking engagements, books, and articles.

6

The court defined "Post-Retiree Spreadsheets/Excel Models" as any "spreadsheet or Excel model that utilizes this methodology that was shown to Anspach during her affiliation with Retiree." The court described Retiree's appropriated methodology as "integrat[ing] all of the[ five] factors and allow[ing] a client to see, in real-time, how changing variables would affect their financial picture." The court otherwise denied defendants' motion, and they timely appealed.

## II

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo." Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1260 (10th Cir. 2007) (quotation omitted). The parties agree that substantive Kansas state law governs this diversity case. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

## A

Anspach first contends that the Confidentiality Agreement is unenforceable. Whether a contractual provision is enforceable is a question of law we review de novo. See Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 956 (10th Cir. 1992). "In Kansas, it is well recognized that a restrictive covenant in an employment contract will only be applied to the extent it is reasonably necessary under the facts and circumstances of the particular case." Puritan-Bennett Corp. v. Richter, 679 P.2d 206, 210 (Kan. 1984). "[O]nly a legitimate business interest may be protected by a noncompetition covenant. If the sole purpose is to avoid ordinary

7

competition, it is unreasonable and unenforceable." Weber v. Tillman, 913 P.2d 84, 89 (Kan. 1996).

As the Kansas Supreme Court has noted, many jurisdictions hold that businesses possess a legitimate interest in protecting "the special training of employees, trade secrets, confidential business information, loss of clients, good will, reputation, seeing that contracts with clients continue, and referral sources." Id. at 91. Kansas Courts have held that businesses may validly protect not only trade secrets, but other confidential information through contract. In Kansas, the "law is clear that an ex-employee may be enjoined from disclosing confidential material and trade secrets gained in the course of his or her employment." Farmers Grp. v. Lee, 28 P.3d 413, 419 (Kan. Ct. App. 2001); see also E. Distrib. Co. v. Flynn, 567 P.2d 1371, 1378 (Kan. 1977) ("The existence of trade secrets as evidence of enticing customers from a former employer is sometimes relevant, but not essential, to injunctive relief in a suit brought for breach of covenant not to compete."); Heatron, Inc. v. Shackelford, 898 F. Supp. 1491, 1500 (D. Kan. 1995) ("Kansas courts have long recognized the employer's right to maintain confidentiality of trade secrets or other commercially sensitive information pertaining to the employer's business practices as an interest entitled to protection.").[1] The policy behind enforcing such

---

[1] In Puritan-Bennett, the Kansas Supreme Court noted that agreements that restrict more than "purely trade secrets, have been held unreasonable." 679 P.2d at 211. But in the same decision, the court held that "[t]he question of trade secret disclosure is not determinative of appellees' right to have the noncompetition covenant in force." Id. at 212. We thus do not read Puritan-Bennett as establishing a rule that only trade secrets are protectable by contract. See Rent-A-Center, Inc. v.

8

confidentiality clauses is to bar an employee from "obtain[ing] an unfair competitive advantage." Weber, 913 P.2d at 92. But contractual provisions that "restrict communication of ideas in general" are impermissible. Puritan-Bennett, 679 P.2d at 211.

Anspach argues the Confidentiality Agreement is overbroad, relying on Puritan-Bennett. There, the court held that a clause prohibiting a former employee from using "any information connected with any aspect of the Company's business" was unenforceable. Id. Similarly, the Confidentiality Agreement in this case barred use or disclosure of "other ideas or inventions relating to the financial services industry."

Although this clause is overbroad, it does not render the entire Confidentiality Agreement unenforceable. In Puritan-Bennett, the Kansas Supreme Court held that "[s]trict enforcement" of the confidentiality clause at issue "would unreasonably infringe upon appellant's right to earn a living." Id. But the court nevertheless enforced the provision to the extent reasonable, enjoining the former employee "from disclosing information relating to Puritan-Bennett's research, development, production or sales techniques of gaseous and chemical aircraft emergency oxygen equipment." Id.

---

Malinowski, 787 P.2d 742, 1990 Kan. App. LEXIS 66, at *3 (Kan. Ct. App. 1990) (unpublished) (in Puritan-Bennett, the Kansas "Supreme Court also held that valid purposes of covenants not to compete are not only to protect trade secrets, but also to prevent an employee from using the expertise learned from his or her former employer to a competitor's benefit").

9

The district court below effectively did the same. It determined that Retiree had developed a "unique methodology . . . which is embodied and expressed through [its] spreadsheet" and that Anspach "appropriate[d] the processes and methodology that underlay Retiree's software and practices." The court made clear that it was not barring Anspach from using spreadsheets, tax and Social Security planning software, or other ideas or inventions related to the financial services industry in general. Instead, the court enjoined the use of Retiree's process and methodology by limiting its injunction to the use of a coordinated spreadsheet that provided live updates based on changing variables, such that a client could compare various strategies' outcomes in real time.

As to this limited universe of information, we agree with the district court that the Confidentiality Agreement is enforceable.[2] As the district court found, "the processes and methodology that underlay Retiree's software and practices" fall within the definition of "Confidential Information" in the Confidentiality Agreement. This is true even omitting the overbroad "other ideas or inventions" clause. Meyer testified that Retiree restricted access to those methods and processes and required confidentiality agreements from anyone given access. He also testified that Retiree was in negotiations with other companies to license Retiree's services or invest in Retiree's intellectual property for millions of dollars. The steps taken by Retiree to

---

[2] We acknowledge that Meyer made overbroad claims about the Confidential Information in his testimony, stating for example that free reports issued to clients without a confidentiality agreement were confidential. But we review the district court's orders, not the claims of Retiree's witnesses.

10

protect its spreadsheet model, combined with Anspach's own words describing the model's novelty, convince us that the information used by Anspach was within the enforceable ambit of the Confidentiality Agreement.

Similarly, that portions of Retiree's methodology use public information does not render the Confidentiality Agreement unenforceable. Even a "trade secret can exist in a combination of components, each of which, by itself, might be in the public domain. A knowledge of the best combination of processes or systems of combination of elements may amount to a trade secret." Mann v. Tatge Chem. Co., 440 P.2d 640, 647 (Kan. 1968). While affiliated with Retiree, Anspach learned valuable confidential information regarding coordination of decumulation strategies. And her spreadsheets changed quickly and dramatically after her relationship with Retiree terminated. In making her new spreadsheets, Anspach used information that she had contractually agreed not to use.

Of course, the line between "ordinary competition" and "unfair competitive advantage," Weber, 913 P.2d at 92, is difficult to draw. So too is the line between "confidential business information," id. at 91, and "ideas in general," Puritan-Bennett, 679 P.2d at 211. Nevertheless, granting due deference to the district court's factual findings, see Weyerhaeuser, 510 F.3d at 1260, we conclude that the restrictions of the Confidentiality Agreement enforced by the district court were "reasonably necessary under the facts and circumstances of the particular case" and thus permissible, Puritan-Bennett, 679 P.2d at 210.

11

## B

Anspach also argues that the district court erred in finding that she breached the Confidentiality Agreement by using and disclosing Retiree's Confidential Information. We review these factual findings for clear error. Weyerhaeuser, 510 F.3d at 1260. "We will reverse for clear error only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." United States v. Martinez-Jimenez, 464 F.3d 1205, 1209 (10th Cir. 2006) (quotation omitted).

## 1

As to Retiree's use claim, Anspach contends Retiree failed to present necessary evidence indicating she misappropriated Retiree's formulas or algorithms. She further argues that the differences between her post-Retiree models and Retiree's spreadsheets demonstrate that she did not use proprietary information. We disagree.

Anspach's argument that her spreadsheets lacked the specific formulas contained in Retiree's spreadsheets is unavailing. The district court expressly found that Anspach did not adopt the specific formulas from Retiree's spreadsheets, but that she nevertheless appropriated "the processes and methodology that underlay Retiree's software." As described supra, Retiree's methods are within the scope of an enforceable agreement regardless of whether Anspach copied particular spreadsheet cells. And after her affiliation with Retiree, Anspach described several features that her "Spreadsheet 2.0" shared with Retiree's spreadsheets as "different from current planning projection models." Thus, Anspach herself stated that the

12

methods she adopted—which were nearly identical to Retiree's methods—were novel.

The court further found that Anspach was able to develop a spreadsheet far more sophisticated that the one she used prior to her affiliation with Retiree in only six months, and concluded this was strong circumstantial evidence that she used Retiree's methods. Anspach counters that her spreadsheet was not as sophisticated as Retiree's. Specifically, she notes that her post-Retiree spreadsheet was not fully integrated. The district court acknowledged that Anspach's models were not as detailed, but concluded that her ability to "replicate parts of Retiree's spreadsheet" in "an abbreviated time" led to the conclusion that Anspach used Retiree's Confidential Information. We are not left with a firm conviction that these findings are mistaken.

**2**

We reach the opposite conclusion as to Retiree's disclosure claim. The district court found that Anspach disclosed "confidential information to Retiree's competitors, including software providers Finance Logix and Social Security Timing." But Retiree states in its briefing that reference to these companies is "misplaced," and that Retiree introduced evidence about the Finance Logix-Social Security Timing transaction merely "to show the reasonableness of the $250,000 liquidated damages number." Retiree instead argues that Anspach disclosed Confidential Information at conferences and in her book.

Meyer testified that Anspach "presented her Excel model" at several RIIA conferences. He did not claim to have attended these conferences, instead stating

13

that "it was written up in the RIIA newsletter." But the newsletter was not introduced. Nor are we directed to any witness testimony contradicting Anspach's account of her presentation. Anspach testified that she showed "client reports, stuff you would show to a client, just as an example of one way to lay out the information" at the conferences. She stated that she "wasn't promoting [her] Excel model."

Meyer's bare-bones testimony that he learned from a newsletter that Anspach presented her model is insufficient to support a finding that Anspach disclosed Retiree's Confidential Information. A factfinder cannot "engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir. 1987) (quotation omitted). Merely displaying client reports would not constitute disclosure of Retiree's Confidential Information. As Meyer conceded, client reports are "in the public domain" and thus "not confidential." Retiree itself provides free client reports to the public, and Retiree's principals have published papers containing client case studies. Simply, client reports demonstrating that Retiree can coordinate various elements are not protectable; rather "how to do it, how these things are coordinated" is. See Puritan-Bennett, 679 P.2d at 211 (covenants that "restrict communication of ideas in general" are unenforceable). Without any substantive evidence that Anspach disclosed to conference attendees how Retiree's methodology operates, the record contains insufficient evidence that she disclosed protectable information at the conferences.

14

Retiree contends that Anspach disclosed Confidential Information in a book she authored. But the portions of Anspach's book Retiree cites merely offer a case study discussing various decumulation scenarios for a hypothetical couple. The case study shows the results of implementing various methods Anspach appropriated from Retiree, but does not disclose how to coordinate the various elements. Again, such case studies are not protectable—and Retiree itself similarly makes case studies publicly available. Meyer also claimed that Anspach disclosed Confidential Information by recommending that her readers use commercially available Social Security calculators. The idea of incorporating Social Security strategies, however, is a general idea, and does not comprise Confidential Information about Retiree's methods. See id. Moreover, referring readers to a commercially available calculator that does not use Retiree's Confidential Information does not disclose any protectable information. Accordingly, we conclude that the district court's finding that Anspach disclosed Retiree's protectable information was without factual support in the record.[3]

---

[3] We also note that regardless of Retiree's concession, Anspach's involvement in the Finance Logix and Social Security Timing transaction would not support a finding that Anspach disclosed Confidential Information. Retiree cited Anspach's statement that Finance Logix would be rolling out a feature to incorporate Social Security taxation thanks to her. Anspach testified that she recommended a commercially available social security calculator offered by Social Security Timing to a Finance Logix principal. Again merely referring a company to commercially available software does not constitute disclosure of Retiree's Confidential Information.

15

**C**

Lastly, defendants argue that the district court's permanent injunction fails to "state its terms specifically . . . and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). Whether an injunction is sufficiently specific is a legal question we review de novo. Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1316 (10th Cir. 1998).

"[A]n injunction cannot be so general as to leave the party open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and thus make him vulnerable to prosecution for contempt." Id. (quotation omitted). "Rule 65(d) requires only that the enjoined conduct be described in reasonable, not excessive, detail—particularly in cases . . . when overly precise terms would permit the very conduct sought to be enjoined." Id. In assessing whether an order complies with Rule 65(d), we construe the district court's language "in light of the injunctive order as a whole." Id.

The district court enjoined defendants from "using their Post-Retiree Spreadsheets/Excel Models" and "utilizing their Post-Retiree Spreadsheets/Excel Models in presentations, speaking engagements, books, and articles." It defined "Post-Retiree Spreadsheets/Excel Models" to include any "spreadsheet or Excel model that utilizes this methodology that was shown to Anspach during her affiliation with Retiree." And it explained that Retiree's methodology was a "model

16

that coordinated the five factors set out in" a prior order[4] in a manner that "integrate[s] all of these factors and allow[s] a client to see, in real-time, how changing variables would affect their financial picture." We hold that this explanation adequately puts defendants on notice of the conduct that is prohibited, and that which is permissible.

Defendants relatedly challenge the injunction's lack of a temporal limitation. Retiree observes that in assessing the reasonableness of a non-competition covenant, Kansas courts consider whether "the time and territorial limitations contained in the covenant reasonable." Id. However, Kansas courts have enforced non-disclosure agreements without any temporal limitation. See Puritan-Bennett, 679 P.2d at 211-12 (enforcing non-disclosure agreement prohibiting disclosure of contractually protected information "during my employment or at any time thereafter"). Because this case concerns a non-disclosure agreement rather than a non-compete covenant baring all competition, the indefinite term is permissible.

### III

For the foregoing reasons, we **REVERSE** the district court's award of $250,000 in damages on Retiree's disclosure claim. We **AFFIRM** the district court's

---

[4] The "prior order" identifies the five factors discussed supra. Defendants do not argue that the injunction violates Rule 65(d) by "referring to the complaint or other document," see Fed. R. Civ. P. 65(d), and any such challenge is waived, see Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

judgment in all other respects and **REMAND** for modification of the damages award consistent with this order and judgment.

Entered for the Court

Carlos F. Lucero
Circuit Judge